The STATE of Ohio, Appellee,

v.

LOGSDON, Appellant.

[Cite as *State v. Logsdon,* 160 Ohio App.3d 517, 2005-Ohio-1875.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–040405.

Decided April 22, 2005.

Keith C. Forman, Assistant City Prosecutor, Julia L. McNeil, City Solicitor, and Ernest F. McAdams Jr., City Prosecutor, for appellee.

Thomas W. Condit, for appellant.

MARK P. PAINTER, Judge.

{¶ 1} Sometimes, the criminal law should not intervene in minimal transgressions. This event was less than minimal. Though the issue underlying the incident is great, the incident itself was small.

{¶ 2} In this case involving a protest at an abortion clinic, the state failed to offer sufficient evidence to prove that defendant-appellant, Joseph Logsdon, committed criminal trespass. Therefore, we reverse Logsdon's conviction and discharge him.

## I. The Incident

{¶ 3} On October 28, 2003, Logsdon was engaged in "sidewalk counseling" in front of Cincinnati Women's Services, an abortion clinic. Logsdon was a regular protester at this particular clinic, usually appearing there several days a week since 1996.

{¶ 4} Logsdon typically posted antiabortion signs visible to clinic patients as they walked into the clinic. Logsdon placed his signs between two fences—the clinic's chainlink fence and a privacy fence belonging to the hotel next door to the clinic. The evidence at trial left it unclear whether Logsdon's signs were actually posted on the clinic property or the hotel property.

{¶ 5} Debi Jackson, the president and executive director of the clinic, testified that on that particular morning, a patient had entered the clinic crying and complaining that a sign in the parking lot had upset her. Jackson headed out to the parking lot and saw one of Logsdon's signs. The sign said, "God has a plan for your baby!" The sign then offered free help and listed a phone number.

{¶ 6} Jackson walked over to the sign, put her finger through the chain link fence and pulled the sign forward so that it fell on the ground. She then slipped it towards her under the chain link fence and picked it up. She folded the sign

up and began walking back towards the entrance of the clinic. Jackson testified that she intended to throw the sign away.

{¶ 7} While Jackson was removing the sign, Logsdon told her that the sign was private property and asked her to leave it alone. · Jackson ignored him. As Jackson headed towards the clinic with Logsdon's sign, Logsdon decided to get the sign back from her. Logsdon testified, "So about that time I decided, well, if she's going to take my property inside, it will be destroyed, and there'll be no evidence if I call the police. So I decided I needed to get the property back before she destroyed it."

{¶ 8} Logsdon entered the clinic property and confronted Jackson. He continued to ask Jackson to return the sign, and when she did not, he grabbed the sign from her. Logsdon then returned to the public sidewalk with his sign. Jackson continued inside to call the police. Both Jackson and Logsdon estimated that Logsdon was on clinic property for less than 90 seconds. The incident should have ended then, but of course it did not.

## II.  Ninety Seconds Begets Two Charges, a Trial, and an Appeal

{¶ 9} Logsdon was charged with criminal trespass and disorderly conduct. The trial court, after a bench trial, found Logsdon not guilty of the disorderly-conduct charge but found that he had trespassed on clinic property without any privilege to do so. The court sentenced Logsdon to 30 days of suspended confinement, 30 days of probation, and a $100 fine. The court then stayed Logsdon's sentence pending this appeal.

{¶ 10} In his two assignments of error, Logsdon argues that the state did not have sufficient evidence to prove that he had committed criminal trespass. The statute for criminal trespass states, "No person, without privilege to do so, shall * * * [k]nowingly enter or remain on the land or premises of another."[1] "Privilege" is defined as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity."[2]

{¶ 11} Logsdon argues that he was privileged to enter the clinic property to retrieve his sign. He claims that he had a long-recognized right to use reasonable means to prevent the theft or destruction of his personal property. He is correct.

---

1.  R.C. 2911.21(A)(1).

2.  R.C. 2901.01(A)(12).

### III.  If It's Not Even a Tort, It's Not a Crime

{¶ 12} The Restatement of Torts states, "One is privileged to enter land in the possession of another, at a reasonable time and in a reasonable manner, for the purpose of removing a chattel to the immediate possession of which the actor is entitled, and which has come upon the land otherwise than with the actor's consent or by his tortious conduct or contributory negligence." [3]  And American Jurisprudence similarly states, "Whenever he may do so peaceably, the owner of a chattel which, without his consent, exclusive negligence, or other default, has been placed upon the land of another may enter and reclaim it without incurring liability in trespass for the taking.  * * * A chattel may also be retaken from the personal possession of one who holds it wrongfully, provided that no breach of the peace is committed by its owner in doing so." [4]

{¶ 13} In *Curtis v. Schuilimit,* the Sixth Appellate District considered the application in Ohio of the Restatement and American Jurisprudence principles concerning privilege to trespass.[5]  Curtis had entered the land of a man named Scheller to retrieve a snowmobile that Curtis claimed he owned.  Apparently Curtis's father had placed the snowmobile on Scheller's land with Scheller's consent, but then the father and Scheller had had a falling out.  At the time that Curtis entered Scheller's land, Curtis did not have Scheller's permission, and he had not made a formal demand upon Scheller to return the snowmobile.  When Scheller discovered Curtis loading the snowmobile on a truck, he indicated that a storage fee had to be paid and ordered Curtis from the land.

{¶ 14} The two men began physically fighting, and then "contact was made" between Curtis's truck and Scheller's truck.  Scheller then removed the keys from Curtis's truck, and Curtis removed certain items of personal property from Scheller's truck.  The police eventually arrived and arrested Curtis for theft and criminal trespass.

{¶ 15} In arguing that the police did not have probable cause to arrest him, Curtis cited both the Restatement and the American Jurisprudence principles that a person is privileged to go on the land of another to reclaim personal property.  The court accepted the proffered law, but ultimately found that under the facts of Curtis's case, he was not privileged.

{¶ 16} The court stated, "We have no quarrel with the law as stated in these citations, but point out that the owner may claim the personalty only where it has

---

3.  Restatement of the Law 2d, Torts (1965), Section 198.

4.  75 American Jurisprudence 2d (2004), Trespass, Section 108.

5.  *Curtis v. Schuilimit* (Nov. 24, 1978), 6th Dist. No. OT–78–19, 1978 WL 214931.

been placed without his consent upon the land of another. Furthermore, in each of the citation[s] it is indicated that the owner may only remove the property peaceably, and at a reasonable time and reasonable manner." [6]

{¶ 17} We agree with the Sixth Appellate District that under the appropriate facts, a person can have a privilege to enter another's land and reclaim personal property. And while the facts in Curtis's case did not invoke the privilege for Curtis, we conclude that the facts in Logsdon's case do present the type of situation in which there was a privilege.

{¶ 18} In *Curtis*, Curtis's father had placed the snowmobile on Scheller's land. And, obviously, Curtis did not peaceably reclaim the snowmobile. But in Logsdon's case, Logsdon's sign was on clinic property because Jackson put it there. Jackson removed it from the fence and carried it away, despite Logsdon's pleas for her not to do so. Therefore, Logsdon did not give consent and was not responsible for the fact that his sign was on clinic property. And the record indicates that Logsdon peaceably retrieved the sign. Logsdon grabbed the sign from Jackson and returned to the public sidewalk, all within 90 seconds. Though he was also charged with disorderly conduct, the court acquitted him of that offense.

{¶ 19} We conclude that Logsdon was privileged to enter the clinic property for the short time that he did for the express purpose of retrieving his sign. Logsdon was appropriately concerned that his sign would be destroyed, and he acted in a quick and peaceable manner to reclaim it.

{¶ 20} In general, taking the law into one's own hands is not recommended— and is usually not legal—but in this case, we simply do not see any culpable behavior on Logsdon's part. And, of course, the whole matter was blown way out of proportion—but that is the reality given the strong feelings on both sides.

{¶ 21} Therefore, we hold that there was insufficient evidence to support Logsdon's conviction for criminal trespass and sustain his two assignments of error. Accordingly, we reverse the trial court's judgment and discharge Logsdon from any further prosecution in this case.

Judgment reversed
and appellant discharged.

GORMAN, P.J., and SUNDERMANN, J., concur.

---

6. Id.