[Cite as *State v. Wilcox*, 2016-Ohio-7865.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT


| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 15AP-957 |
| v. | : | (C.P.C. No. 14CR-2168) |
| Christina M. Wilcox, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on November 22, 2016


**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie Swanson*, for appellee.

**On brief:** *Sydow Leis LLC*, and *Anastasia L. Sydow*, for appellant.


APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Christina M. Wilcox, appeals from the judgment entry of the Franklin County Court of Common Pleas finding appellant guilty of aggravated burglary. For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On April 24, 2014, plaintiff-appellee, State of Ohio, indicted appellant with one count of aggravated burglary in violation of R.C. 2911.11, a first-degree felony, arising from an altercation with Amanda Cooksey in Cooksey's residence. Appellant originally entered a plea of not guilty, then changed her plea to guilty to the lesser-included offense of burglary, pursuant to R.C. 2911.12, but ultimately withdrew her guilty plea. The case

proceeded to a jury trial from September 21 to 24, 2015, and the state presented its case-in-chief.

{¶ 3} Jason Penhorwood, an officer with the Columbus Division of Police, testified that on April 6, 2014, he was dispatched to the home of Cooksey at approximately 1:00 a.m. He took approximately three to five minutes to reach the home and arrived at the same time as another officer, Aaron Slomovitz. He made contact with Cooksey while Slomovitz made contact with the male present at the home, later established to be Don Williams, a recurrent romantic interest of both Cooksey and appellant. According to Penhorwood, Cooksey held a bloody rag or paper towel and appeared as if "she had been punched in the face" with an injury to her nose. (Tr. Vol. I at 38.) Penhorwood called Detective Matthew Smith to relay preliminary information gained from his interview with Cooksey.

{¶ 4} On cross-examination, Penhorwood confirmed that appellant's Exhibit A accurately depicted Cooksey's house, which was a two-story residence with a front porch and a walkway connecting the porch to an attached garage. Penhorwood testified that the garage door was open when he was present at the home and that he was told appellant entered the home through the garage. When asked whether anyone told him that Williams opened the door within the garage for appellant to come into the home, Penhorwood responded "[n]obody told me that they let her in, they said she was not allowed in the residence." (Tr. Vol. I at 47.) Penhorwood testified that he did not interview Williams but had some limited contact with him later in the evening when Williams became "belligerent" and uncooperative with detectives. (Tr. Vol. I at 48.)

{¶ 5} Slomovitz testified to responding to a call to the Cooksey residence on April 6, 2014, and arriving there separately but at the same time as Penhorwood. The garage door at the house was open. The officers met with Cooksey and Williams and according to Slomovitz:

> We were informed that [appellant] had entered the property and had attacked the female occupant of the house. Mr. Williams had stated to me that she was not allowed to be in the premises or on the premises or in the home. And then after that he didn't want to give me any other information. Basically had stated that he didn't want her to get in trouble

and was crying and didn't really give any other information
about what was going on.

(Tr. Vol. I at 58.)

{¶ 6}  Slomovitz testified that he spoke with Williams for "[m]aybe five or ten minutes," confirmed Williams was emotional and crying, and stated that after detectives arrived Williams became really loud and belligerent and refused to provide more information.  (Tr. Vol. I at 58.)  After concluding with his work at the Cooksey residence, Slomovitz unsuccessfully attempted to locate appellant at another residence.

{¶ 7}  On cross-examination, Slomovitz testified that in bringing the charge of aggravated burglary, he relied on Williams' statement that appellant is not allowed on the property or premises.  He confirmed that he saw Williams break down and start to cry and stated he did not want to see appellant get into trouble.

{¶ 8}  Detectives Smith and Katherine Zimmer of the Columbus Division of Police then testified to responding together to a call to investigate an incident at Cooksey's residence.  Smith testified that when he arrived, he walked through the open garage door, entered the home through a door inside the garage, and spoke to the officers at the scene. Smith began taking photographs of the home and then attempted to interview Williams, who was agitated and yelling at the officers.  He had a brief conversation with Williams, which essentially entailed Williams screaming at Smith and refusing to give a statement. Smith ascertained from other officers that Williams did not live at the residence, so he asked Williams to leave the home as he was hindering the investigation.  Williams left through the front door.  Smith did not see Williams break down and cry.

{¶ 9}  Zimmer, the lead detective investigating the incident at the Cooksey residence, testified that she and Smith arrived at approximately 1:13 a.m.  At that time, Zimmer and Smith were told by officers that a female had gone into the residence and assaulted another female inside the residence.  Zimmer interviewed Cooksey who, according to Zimmer, "was both angry and upset that somebody had broke into her house and had assaulted her like that.  She felt like a victim that, this is her home and somebody has broke into her home and assaulted her."  (Tr. Vol. I at 105.)  Officers showed Zimmer a bloody tissue that that was sitting in the bathroom.  Zimmer returned to the office, put

out a warrant for appellant, and attempted to contact her.  Later, Zimmer was notified that appellant turned herself in.

{¶ 10} On cross-examination, Zimmer agreed that during the interview Cooksey told her she was upstairs in the bedroom at the time appellant came into the house and that Williams:

> [W]ent downstairs with the intention of opening the door because somebody had been knocking at the door for quite awhile. * * * She said that he had stopped to put on some shoes * * * or something like [that] because they were under the impression that it was [appellant] and he was going, would be my assumption, to go out and talk to her which is why he put on his shoes.  And that's when she heard the door to the garage, the inside residence door to the garage open.

 (Tr. Vol. I at 110-11.)

{¶ 11} Zimmer later specified that, according to Cooksey's statement, Williams was not near the door when he was putting on his shoes.  Rather, when the door opened, Cooksey heard Williams downstairs right below her, by the front door in the opposite direction of the door to the garage.  In Zimmer's opinion, no force was used to enter the property, but she believed appellant entered the premises without permission in a deceptive manner.  Regarding the relationship between the three involved, Cooksey told Zimmer that "Williams had been playing [appellant and Cooksey] back and forth for over five years" and that Williams had moved out of her home and was no longer living there. (Tr. Vol. I at 116.)  Zimmer could not remember the exact length of time that Cooksey said Williams had stayed at her home.  Zimmer testified that Cooksey pointed out appellant's car to her, which Zimmer believed was the car parked on the street.  Zimmer was under the impression that appellant had driven the car to Cooksey's house.

{¶ 12} Cooksey testified that she knew appellant through Williams who, over the course of over six years, had "gone back and forward between [Cooksey and appellant] being dishonest with both of us about who he was with."  (Tr. Vol. II at 166.)  Cooksey's relationship with Williams ended about one and one-half month to two months prior to the night of the altercation, and when the relationship ended Williams moved out of Cooksey's house after having lived with Cooksey, on and off, for approximately the last

three or four years. Cooksey characterized her relationship with appellant as sometimes civil but not civil or on good terms on the night of the altercation.

{¶ 13} On the night of the altercation, Williams and Cooksey hung out at a local bar together. Cooksey left to pick up her kids and bring them home, and Williams later drove to Cooksey's home using appellant's Toyota. Roughly around 2:00 a.m., Cooksey and Williams were upstairs in her home when they heard someone ringing the doorbell and repeatedly knocking on the door. Cooksey looked out the upstairs front window and saw a car with Indiana license plates in front of the home. Cooksey and Williams went downstairs, looked out another window, and heard appellant's voice outside, which was "[a]ngry." (Tr. Vol. II at 173.) According to Cooksey, Williams, who was not clothed at all, walked toward his clothing, which was located on a chair in an entranceway between the living room and dining room area. Cooksey returned upstairs to the bedroom to put on her clothes. As she was finding her clothes, Cooksey heard the door leading from her home to the garage open. She knew that specific door opened because of its distinct squeak. Cooksey then heard appellant's voice "very loud" inside of the home, but Cooksey could not recall what she said. (Tr. Vol. II at 174.) At that point, according to Cooksey, she "could hear [Williams] still over in the living room area which is on the opposite end of the home" and believed he was "putting his clothing on." (Tr. Vol. II at 174, 185.) Cooksey heard Williams say something and testified that his voice came from the living room area. Cooksey did not hear Williams walking around on the wood floors and did not hear Williams invite appellant into the home at any time. Cooksey then:

> [H]eard someone coming up the stairs. And as they got to the top of the stairs, I began to walk out of my bedroom door. As soon as I got outside of my bedroom door, I then saw [appellant] who began yelling more at me.
>
> And I, you know, kind of was caught off guard. And then she swung her fist with her keys in it and hit me in my nose. I then began a struggle with her, telling her to get out of my home. What are you doing? The struggle went back toward my steps in front of my youngest, my four-year old's bedroom, that happened for a few moments.
>
> Mr. Williams then came up the stairs and tried, you know, his best to get in between us. [Appellant] was on the step at one

> point and when he came upstairs and got between us he was able to get her to go all the way downstairs and kind of split us apart.

(Tr. Vol. II at 176.) Cooksey noted that Williams had his boxers back on by the time he separated her and appellant.

{¶ 14} Appellant left Cooksey's home, and Cooksey immediately called the police. As a result of the altercation, Cooksey had a scratch on her nose and a nose bleed. Cooksey observed marks on Williams' face and arms and described Williams' demeanor as "very mad." (Tr. Vol. II at 179.) Officers arrived quickly, and Cooksey provided statements to the responding officer and detective. According to Cooksey, she had never given Williams the permission to invite appellant into the home generally or on the night of the incident and that she did not intend to let appellant inside the home. She testified that she usually closes the garage door at night and leaves the door leading into the home from the garage unlocked. On the night of the altercation, she or Williams inadvertently left the garage door open, and the door leading into the home was unlocked.

{¶ 15} On cross-examination, Cooksey agreed that she did not see whether Williams let appellant into the home and agreed that she could not state as certain that Williams did not open the door for appellant. Cooksey disagreed that Williams went downstairs to answer the door and, instead, testified that she and Williams went downstairs initially to make sure it was appellant at the door and noted that "[n]either one of us were in any position to answer the door." (Tr. Vol. II at 194.) Cooksey agreed on cross-examination that the door was not damaged and that to her knowledge, force was not used to open the door. Cooksey said she did not tell Zimmer that she heard Williams' shoes.

{¶ 16} On redirect, Cooksey testified that Williams initially left by walking away from the home but, shortly after the officers left, she saw Williams return, get into appellant's Toyota, and leave. Regarding the door to her home, Cooksey testified that it is tight in the doorframe and agreed that someone has to use force to open it. Cooksey reiterated that while she did not see appellant enter her home, she simultaneously heard the door open and Williams on the other side of the house. Based on what she heard, Cooksey testified that she was "absolutely sure" that Williams did not open the door for

appellant to come into her home on the night of the altercation.  (Tr. Vol. II at 211.)  On recross, Cooksey testified, "[w]ould I put everything on the fact that he did not open that door?  Absolutely."  (Tr. Vol. II at 213.)

{¶ 17}  Thereafter, state's exhibits 1-13, which included photographs of Cooksey's residence and the Toyota parked in front of the residence on the street, were admitted without objection, and appellee rested it case-in-chief.  Appellant moved the trial court for a Crim.R. 29 ruling, arguing that appellee failed to prove, beyond a reasonable doubt, the element of trespass by force, threat, or deception.  The trial court denied the motion, finding the evidence sufficient to meet the legal definition of force.

{¶ 18}  The defense then called Williams to testify.  According to Williams, he spent the early part of April 5, 2014 at appellant's house due to a medical event with her eldest daughter.  He later took appellant's Toyota to a bar to watch a basketball game, using the only set of keys to the car.  Cooksey came into the bar, and later that evening, Williams drove appellant's car to Cooksey's house and parked the car on the street.  Cooksey was already at home, and appellant entered the home through the open garage door.  While upstairs with Cooksey, he heard the doorbell ringing.  According to Williams, he "walked downstairs and went to the garage door that [he] came in * * * and asked what did [appellant] need?"  (Tr. Vol. II at 233-34.)  Williams agreed that he opened the door from the inside of the house and that appellant was "coming from * * * the front door, standing into the driveway."  (Tr. Vol. II at 234.)  Appellant responded that she needed her keys. Williams "told her to come get her keys" and that the keys were upstairs in his jeans.  (Tr. Vol. II at 235.)  Williams walked upstairs, with appellant following him.  Appellant waited at the top of the stairs as he retrieved the keys from his jeans in the bedroom.  When Williams came out to give appellant her keys, appellant and Cooksey were in a "scuffle." (Tr. Vol. II at 236.)  He did not see who started the scuffle since he was in the bedroom at that time.  According to Williams, the responding officers just asked him to sit down and did not ask him any questions.  Williams testified that he did not break down and cry. After Williams left Cooksey's house, he walked away on foot because he "gave [appellant] her keys and that was the vehicle that I came up in.  I didn't have a ride so I walked."  (Tr. Vol. II at 240.)

{¶ 19} On cross-examination, Williams testified that after the altercation at issue, he married appellant. At the time of the incident, Williams viewed appellant as his girlfriend and the mother of his child and viewed Cooksey as a friend with whom he had sex with on occasion and who he had stayed with a few times. He confirmed that while he told appellant he was going to a bar, he did not tell her he was going to Cooksey's home. Williams testified that when appellant arrived at Cooksey's home, he was upstairs with an undershirt but no pants on and was "preparing to have sex." (Tr. Vol. II at 249.) On hearing the doorbell, he walked downstairs without his pants on, leaving his clothing upstairs. Through the front window in the living room he saw appellant standing on the doorstep to the front door. Williams testified that he passed by the front door where appellant was standing and instead proceeded to the door leading out to the garage, which he and Cooksey normally used. Williams confirmed that he opened the door leading to the garage, asked what appellant needed, and invited her into the house and upstairs to an area where he last saw Cooksey. Williams agreed that he invited his current girlfriend inside, while he was pantless in the home of a women he was about to have sex with, and invited his girlfriend upstairs while he retrieved keys from the other woman's bedroom. The option to have appellant wait outside while he retrieved the keys did not cross Williams' mind. When upstairs, Williams did not see Cooksey in the bedroom, but he heard what sounded like a fight. He broke up the fight between Cooksey and appellant, walked appellant back down the stairs, and gave her the car keys before she left through the garage door. Williams testified that after he was told to leave by police, he walked to a friend's house around the corner. Williams could not remember the friend's last name or address but said he had been to his friend's house many times, and the friend had no issues with him arriving that early in the morning. Williams agreed that if Cooksey, the responding officer, and the detective stated that Williams said he did not let appellant into the home, they all would be lying.

{¶ 20} Appellant then testified in her own defense. According to appellant, on April 5, 2014, Williams used her car to pick her and her daughter up from Nationwide Children's Hospital after her daughter was hospitalized for five days due to a blood infection. Williams dropped them off at appellant's home, where appellant's mother and mother's husband, in town from Indiana, were present to check on her daughter.

Appellant's mother and her husband were preparing to leave town and return to Indiana that day or night. After dropping them off, Williams told appellant he was going to a bar. Late in the day, when Williams did not return her car, appellant borrowed her mother's car and checked several bars that Williams normally frequents. She eventually found her car parked outside of Cooksey's residence. She touched the hood of her vehicle to see if the car had been running recently and found the engine cold, so she concluded the engine had not been running. Appellant walked to Cooksey's front porch and rang the doorbell and knocked for several minutes. She heard footsteps on the inside stairs but still no one answered. She then heard Williams call her name from the direction of the open garage and walked in that direction. From the driveway, she could see his head peering out from a door inside the garage that leads to the house, which was cracked but not fully open. Williams asked what she wanted, and appellant replied she just wanted her keys. According to appellant, her attention was focused on her sick child at home and how she would transport her daughter to the hospital if needed, considering that her mother was leaving town. Appellant's only means of transportation was the car that Williams used that evening. Appellant noted that when she purchased the vehicle, she was only given one set of keys to the car.

{¶ 21} Williams told her to come inside, and appellant followed him through the doorway. Appellant testified that she noticed he did not have on any clothes, and she said "I don't care about you being here, I just want my keys. Where are my keys," and Williams told her they were in his pants and said "come upstairs and get them." (Tr. Vol. II at 287.) She followed Williams upstairs to the top landing and waited there while Williams turned into a doorway. At that point, according to appellant, Cooksey charged at appellant from another doorway, perhaps the bathroom. Appellant "went backward towards the wall as [Cooksey's] pushing and [they] began to fight." (Tr. Vol. II at 288.) Appellant testified that she did not start the fight with Cooksey. Appellant tried to prevent herself from going down the stairs. With Cooksey overtop of her, both women punched at each other. Williams intervened, and appellant walked down the stairs and went to the living room with Williams, where he gave her the car keys. Appellant exited through the garage. Later, after officers made contact at appellant's residence, appellant and her

mother drove back to Cooksey's house and drove the Toyota home. After learning that the police were looking for her, appellant contacted an attorney and turned herself in.

{¶ 22} On cross-examination, appellant testified that Williams lived with her at the time of the altercation and that it was normal for Williams to drive her car with her permission. She let Williams borrow her car on the evening of April 5, 2014 only to watch a basketball game at a nearby bar, then return home after the game because her mother had to leave that night for Indianapolis to be at work in the morning, and appellant would be without a car. According to appellant, once she located her car at Cooksey's house, she touched the hood of her car to see how long the car had been there but testified that it would not have made a difference to her how long Williams had been at the house. Appellant was not bothered that she found her car at Cooksey's house and was not mad that Williams probably had been at Cooksey's house a while. She was not bothered at all that Williams did not answer his cell phone when she tried to call him. When Williams answered the door with no clothes on at all, appellant was not mad and remarked this was "[t]ypical" Williams. (Tr. Vol. II at 310.) It did not cross her mind to ask Williams to bring her the keys, and she did not anticipate running into Cooksey at all. Appellant followed Williams upstairs, and, as she waited, Cooksey came out of the bathroom, called her a "bitch," and asked her what she was doing there with an aggressive nature. (Tr. Vol. II at 311.) After appellant replied that she wanted her keys, Cooksey charged her, and although appellant would not say Cooksey assaulted her, the two "had a mutual combat." (Tr. Vol. II at 312.) Cooksey felt threatened and was defending herself and had her mother's car keys in her hand. When asked whether she had spoken about the altercation with Williams, now her husband, appellant responded "we probably have," but they did not compare stories or speak "in any great details or length." (Tr. Vol. II at 316, 319.)

{¶ 23} Defense exhibits, two photographs of the exterior of Cookey's residence, were then admitted without objection. Appellant's counsel renewed the defense's Crim.R. 29 motion, which the trial court again denied.

{¶ 24} The jury found appellant guilty of aggravated burglary.[1]   A sentencing hearing was held on September 28, 2015.   The trial court denied appellant's renewed Crim.R. 29 motion and, by judgment entry dated the same day, sentenced appellant to a period of community control under basic supervision[2] for one year, imposed sanctions including no new convictions, obtaining a NetCare evaluation and following those recommendations, and having no contact with the victim.   Appellant filed a timely appeal to this court.

## II.  ASSIGNMENTS OF ERROR

{¶ 25} Appellant presents five assignments of error:

[1.] THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-APPELLANT'S CRIMINAL RULE 29 (A) MOTION FOR ACQUITTAL ON THE CHARGE OF AGGRAVATED BURGLARY BECAUSE THE EVIDENCE PRESENTED BY THE STATE WAS INSUFFICIENT TO SUPPORT A CONVICTION BEYOND A REASONABLE DOUBT.

[2.] THE VERDICT IS AGAINST THE SUFFICIENCY AND MANIFEST WEIGHT OF THE EVIDENCE.

[3.] THE TRIAL COURT PLAINLY ERRED WHEN IT FAILED TO PRESENT A JURY INSTRUCTION ON SELF-DEFENSE WHERE THE MANIFEST WEIGHT OF THE EVIDENCE SHOWS THAT THE DEFENSE, BY A PREPONDERANCE OF THE EVIDENCE, PROVED THAT DEFENDANT WAS ENTITLED TO SELF-DEFENSE.

[4.] DEFENDANT IS NOT GUILTY OF AGGRAVATED BURGLARY WHERE THE MANIFEST WEIGHT OF THE EVIDENCE SHOWS THAT THE DEFENSE, BY A PREPONDERANCE OF THE EVIDENCE, PROVED THAT DEFENDANT WAS ENTITLED TO MITIGATION UNDER A THEORY OF ADEQUATE PROVOCATION, THEREBY REDUCING THE CHARGE TO THE LESSER-INCLUDED OFFENSE OF AGGRAVATED TRESPASS.

---

[1] We note that both the original and amended judgment entry incorrectly cite aggravated burglary as a violation of R.C. 2903.11, rather than R.C. 2911.11.
[2] The amended judgment entry changed basic supervision to "Basic Non-Reporting Telephone Supervision." (Oct. 15, 2015 Am. Jgmt. Entry at 1.)

[5.] DEFENDANT WAS EFFECTIVELY DENIED HER CONSTITUTIONAL RIGHT TO ASSISTANCE OF COUNSEL DUE TO COUNSEL'S FAILURE TO OBJECT TO THE ADMISSION OF HEARSAY EVIDENCE AND FAILURE TO REQUEST A SELF-DEFENSE JURY INSTRUCTION.

## III.  DISCUSSION

### A.  First Assignment of Error

{¶ 26} Under the first assignment of error, appellant contends that the trial court erred in overruling her Crim.R. 29(A) motion for acquittal because insufficient evidence supported a conviction for aggravated burglary.  For the following reasons, we disagree.

{¶ 27} Crim.R. 29(A) states in pertinent part:

> **Motion for judgment of acquittal.**  The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.

A Crim.R. 29(A) motion for an acquittal tests the sufficiency of the evidence.  *State v. Brown*, 10th Dist. No. 10AP-1204, 2011-Ohio-4766, ¶ 27, *discretionary appeal not allowed*, 131 Ohio St.3d 1439, 2012-Ohio-331.  Accordingly, we review the trial court's denial of appellant's motions for an acquittal using the same standard applied for reviewing a sufficiency-of-the-evidence claim.  *Id.*

{¶ 28} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Whether the evidence is legally sufficient to support a verdict is a question of law, not fact.  *Id.*  In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds

could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 29} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). Further, "the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42. *See also State v. Clark*, 10th Dist. No. 15AP-926, 2016-Ohio-5493, ¶ 25.

{¶ 30} In order to find appellant guilty of aggravated burglary, appellee had the burden to prove beyond a reasonable doubt that appellant (1) trespassed, as defined by R.C. 2911.21; (2) by force, stealth, or deception; (3) in an occupied structure or in a separately secured or separately occupied portion of an occupied structure; (4) when another person other than an accomplice is present; (5) with the purpose to commit within that structure any criminal offense; and (6) the offender inflicts or attempts or threatens to inflict physical harm on another and/or the offender has a deadly weapon or dangerous ordinance on or about the offender's person or under the offender's control. R.C. 2911.11(A).

{¶ 31} Appellant contends that appellee failed to present evidence establishing trespass by force, stealth, or deception. We agree with appellant that the evidence here, even when viewed in a light most favorable to the prosecution, cannot reasonably support a finding that appellant employed stealth or deception to enter Cooksey's home and/or to remain there. Therefore, the question dispositive to this assignment of error is whether sufficient evidence proves appellant committed a trespass by force.

{¶ 32} A criminal trespass entails, in relevant part, knowingly entering or remaining on the land or premises of another, without privilege to do so. R.C. 2911.21. " 'Privilege' means an immunity, license, or right conferred by law, bestowed by express or

implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12). A privilege may terminate or be revoked. *State v. Steffen*, 31 Ohio St.3d 111 (1987). Thus, "permission to enter a home is deemed terminated by the act of committing an offense of violence against a person authorized to revoke the permission." *State v. Metcalf*, 2d Dist. No. 24338, 2012-Ohio-6045, ¶ 20, quoting 2 Katz, Martin, Lipton & Crocker, *Criminal Law*, Section 104:6 (3d Ed.).

{¶ 33} In limited situations, a person is privileged to enter the land of another for the purposes of reclaiming personal property that is on the land without that person's consent and not due to the person's negligence or fault. *State v. Logsdon*, 160 Ohio App.3d 517 (1st Dist.2005), syllabus, *discretionary appeal not allowed*, 106 Ohio St.3d 1534, 2005-Ohio-5146. However, such a person must carry out the retrieval "peaceably" at a reasonable time and in a reasonable manner. *Id.* at syllabus and ¶ 12, quoting Restatement of the Law 2d, Torts, Section 198 (1965), and 75 American Jurisprudence 2d, Trespass, Section 108 (2004).

{¶ 34} In *State v. Pearson*, 10th District No. 14AP-793, 2015-Ohio-3974, ¶ 24, we defined "force" in context of a trespass as follows:

> Force is defined in R.C 2901.01(A)(1) as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." Any force effecting entrance, however slight, satisfies this element. *In re A.C.D.*, 12th Dist. No. CA2014-06-085, 2015-Ohio-232, ¶ 12; *Goins v. State*, 90 Ohio St. 176, 181, 107 N.E. 335, 12 Ohio L. Rep. 13 (1914), syllabus ("Where, any force, however slight, is required to effect an entrance into a building through a doorway partly open, such act constitutes a forcible breaking."). The opening of a closed door, even if unlocked, falls under the definition of force. *State v. Stump*, 5th Dist. No. 13-CA-0006, 2014-Ohio-1706, ¶ 18; *State v. Wilson*, 8th Dist. No. 80270, 2002-Ohio-3107; *State v. Lane*, 50 Ohio App.2d 41, 361 N.E.2d 535 (10th Dist.1976). To further open a door which is already partially open is also considered force. *Stump*, citing *Goins* at 181; *State v. McLeod*, 5th Dist. No. 14 CA 53, 2015-Ohio-93, ¶ 56.

{¶ 35} Here, according to appellant, she was privileged to enter Cooksey's home for the purpose of reclaiming her car keys both through Williams' invitation and/or through her privilege to enter the land of another to retrieve her chattel (i.e., her keys and

ultimately her car). Furthermore, appellant argues that appellee cannot rely on alleged assault to terminate any privilege because appellant was acting to defend herself. Since appellant asserts that Williams opened the door for her, she argues that she did not use force to enter Cooksey's home.

{¶ 36} Essentially, appellant's argument depends on this court believing her version of events rather than the evidence presented by appellee, an inappropriate position for this court to take in reviewing the sufficiency of the evidence. Instead, we must determine whether, if believed, the evidence presented by appellee is sufficient to support the conviction.

{¶ 37} Here, Cooksey testified that she, appellant, and Williams were part of a long-standing, back-and-forth love triangle and that on the night of the incident, the relationship between Cooksey and appellant was not civil. Cooksey testified that it was not her intention to allow appellant onto her property and that Williams neither lived at her property or had permission to allow others onto her property. Slomovitz indicated that minutes after the altercation, Williams, who was in an emotional state, stated that appellant was not permitted in Cooksey's residence. According to Cooksey, appellant's voice was angry as she stood outside at the front door in the early hours of April 6, 2014. Furthermore, Cooksey repeatedly testified that, at the moment the door to the garage opened, she personally heard Williams at the opposite side of her house near where he left his clothes, which is consistent with what she told Zimmer on the night of the altercation. Under Cooksey's version of events, moments after the door opened, she heard appellant's "very loud" voice inside of the home while continuing to hear Williams in the opposite side of the home, then was confronted by appellant upstairs near Cooksey's bedroom door where appellant yelled at her and hit her. (Tr. Vol. II at 174.) Cooksey testified that Williams had his boxers back on when he separated her and appellant from fighting, in line with her testimony that when the door to the garage opened Williams was located near his clothes by the living room. Cooksey immediately called the police and testified to later observing Williams drive appellant's Toyota away from her home.

{¶ 38} Cooksey's testimony, if believed, provided sufficient evidence for a rational trier of fact to have concluded that appellant, without permission, knowingly entered Cooksey's attached garage and home interior and used force to do so, pursuant to

*Pearson*, by opening a closed but unlocked door. *Strong* at ¶ 42. Overall, after viewing the evidence in a light most favorable to appellee, reasonable minds could find appellant guilty of aggravated burglary beyond a reasonable doubt. Therefore, sufficient evidence supports appellant's conviction.

{¶ 39} Accordingly, appellant's first assignment of error is overruled.

**B.  Second Assignment of Error**

{¶ 40} Under the second assignment of error, appellant contends that her conviction for aggravated burglary is against the manifest weight of the evidence because appellee "failed to adduce any evidence demonstrating beyond a reasonable doubt that she entered [Cooksey's] residence by force, stealth, or deception" for all the reasons argued in the first assignment of error. (Appellant's Brief at 24.)

{¶ 41} When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 42} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14, citing *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 55. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on

manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *discretionary appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 43} In this assignment of error, appellant does not challenge the weight of the evidence beyond its alleged insufficiency. In the first assignment of error, we already determined that the evidence in this case is sufficient to support appellant's conviction for aggravated burglary. Therefore, to the extent this assignment of error again challenges the sufficiency of the evidence, it is overruled.

{¶ 44} Moreover, our review of the record does not show that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The evidence offered to support the defense theory of the case—that appellant calmly sought to retrieve her car keys and that Williams opened the door for her—lacks credibility. Williams' testimony is undermined by the fact that after the altercation, he married appellant, the mother of his child, and by the unlikely scenario he presented whereby, in the midst of cheating on his girlfriend at another woman's house, he answered the door naked and invited his girlfriend upstairs near the bedroom. Williams' testimony that he gave appellant back the sole set of car keys and walked away to a nearby friend's house is undercut by his testimony that he does not know the address or last name of that friend who he purportedly has stayed with many times, as well as Cooksey's testimony that she observed Williams drive the car away himself. Likewise, appellant's insistence that she was not mad at finding her car and her naked boyfriend at Cooksey's house in the middle of the night is both implausible and incongruous with her discussion of how she determined how long he had been present in the home. Overall, this case essentially hinged on which story the jury believed amid conflicting testimony. Considering the credibility issues apparent with Williams and appellant's testimony, we cannot say that is one of the exceptional cases in which " 'the evidence weighs heavily against conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

{¶ 45} Accordingly, appellant's second assignment of error is overruled.

**C. Third Assignment of Error**

{¶ 46} Under the third assignment of error, appellant contends that the trial court erred in failing to present a jury instruction on self-defense. Because appellant did not object to the jury instructions, she agrees a plain-error standard of review applies.

{¶ 47} " 'An alleged error is plain error only if the error is "obvious," *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240, and "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.' " *State v. Arnold*, ___ Ohio St.3d ___, 2016-Ohio-1595, ¶ 65, quoting *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 181. *State v. Obermiller*, ___ Ohio St.3d ___, 2016-Ohio-1594, ¶ 62, quoting Crim.R. 52(B) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). Plain error should be noticed only "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*, quoting *State v. Long*, 53 Ohio St.2d 91, 97 (1978).

{¶ 48} "[A] trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206, 210 (1990). "To be entitled to a jury instruction on an affirmative defense such as self-defense, a defendant must introduce sufficient evidence that, if believed, would raise a question in the minds of reasonable jurors as to the existence of such an issue." *State v. Parnell*, 10th Dist. No. 11AP-257, 2011-Ohio-6564, ¶ 12, *discretionary appeal not allowed*, 131 Ohio St.3d 1539, 2012-Ohio-2025, citing *State v. DiFrancesca*, 10th Dist. No. 10AP-340, 2011-Ohio-3087, ¶ 34, citing *State v. Melchior*, 56 Ohio St.2d 15 (1978), paragraph one of the syllabus. However, " '[i]f the evidence generates only a mere speculation or possible doubt, such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted.' " *State v. Brooks*, 2d Dist. No. 23784, 2010-Ohio-5886, ¶ 30, *discretionary appeal not allowed*, 129 Ohio St.3d 1474, 2011-Ohio-4751, quoting *State v. McGhee*, 2d Dist. No. 23226, 2010-Ohio-977, ¶ 42, *discretionary appeal not allowed*, 126 Ohio St.3d 1514, 2010-Ohio-3331.

{¶ 49} To establish self-defense, the defendant must show by a preponderance of the evidence that (1) she was not at fault in creating the situation giving rise to the affray, (2) she had both reasonable grounds to believe and an honest belief, even if mistaken, that she was in imminent danger of bodily harm, and (3) the only means of protection from that danger was the use of force not likely to cause death or great bodily harm. *DiFrancesca* at ¶ 33.  Not at fault in creating the situation giving rise to the affray does not necessarily require that the actor "refrained from throwing the first punch."  *State v. Nichols*, 4th Dist. No. 01CA2775 (Jan. 22, 2002).  Rather, it is a broader concept which embodies the idea that a person cannot provoke assault or voluntarily enter an encounter and then claim a right of self-defense.  *State v. Smith*, 4th Dist. No. 02CA73, 2003-Ohio-1710, ¶ 12; *Nichols*.

{¶ 50} As a preliminary issue, appellant does not provide authority for self-defense as a defense to aggravated burglary or providing a self-defense jury instruction in an aggravated burglary case where the defendant is the alleged trespasser and not the homeowner.  Our review revealed few cases on the subject.

{¶ 51} In *State v. Higgins*, 2d Dist. No. 18974, 2002-Ohio-4679, the court found that self-defense was not available as a defense to aggravated burglary in a case where the defendant fought the victim in the victim's apartment and testimony conflicted regarding whether defendant was invited or forced his way into the apartment.  *Id.* at ¶ 5-6, 19.  The *Higgins* court first noted that, according to the Supreme Court of Ohio, self-defense is essentially justification for admitted conduct which does not negate the underlying elements of the offense and that aggravated burglary includes trespass as an essential element.  *Id.* at ¶ 17-18, citing *State v. Martin*, 21 Ohio St.3d 91, 94 (1986).  The court reasoned that a trespass "presupposes * * * fault in creating the situation that gave rise to the altercation" and, therefore, is "inconsistent" with self-defense.  *Higgins* at ¶ 19.  Thus, the court held that the defendant was not entitled to a jury instruction on self-defense and trial counsel's performance was not deficient in having failed to ask for the instruction. *Id.* at ¶ 19, 44-45.

{¶ 52} In *State v. Griffin*, 2d Dist. No. 20681, 2005-Ohio-3698, after noting that the parties did not indicate how self-defense is relevant to a charge of aggravated burglary in light of the defendant's acquittal of felonious assault, the court "assume[d] that self-

defense was not mooted" because the state asserted the defendant trespassed on the victim's residence with the purpose of committing an assault and inflicted harm on another. *Id.* at ¶ 16, fn. 1. Therefore, the court indicated that "if there is sufficient evidence on the use of self-defense involving non-deadly force in an aggravated burglary case, the trial court must instruct the jury on that defense." *Id.* at ¶ 16. Likewise, in *State v. Halcomb*, 3d Dist. No. 13-12-13, 2013-Ohio-1301, it appears that the jury considered the trespasser-defendant's claim of self-defense in an aggravated burglary case, and the court found the jury's express decision on self-defense notable. *Id.* at ¶ 5, 11, 22, 27.

{¶ 53} Considering the scant and disparate law on the topics, we cannot say an " 'obvious' " error occurred on the facts of our case. *Arnold* at ¶ 65, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Furthermore, even if appellant's version of events is believed, evidence fails to establish that appellant was not at fault in creating the situation giving rise to the affray. Appellant undisputedly proceeded to the upstairs bedroom area of her rival's home at a very early hour of the morning, would not testify that Cooksey assaulted her, and characterized the affray as "mutual combat." (Tr. Vol. II at 312.) Considering all the above, the trial court did not err in not instructing the jury on self-defense in this case.

{¶ 54} Moreover, even if the lack of an instruction amounted to obvious error, appellant has not shown that a lack of a jury instruction on self-defense affected the outcome of the trial. Appellant's version of events, as discussed in the second assignment of error, lacked credibility while appellee's versions of events benefitted from the consistency between her statements and actions on the evening of the altercation and her testimony at trial. In addition, the jury did consider and reject appellant's theory of defending herself while calmly retrieving her keys. In order for the jury to find appellant guilty of aggravated burglary, it necessarily had to consider and find that she trespassed, which is "inconsistent with the defense of self-defense," and did so with purpose to commit a criminal offense rather than to peaceably retrieve her keys. *Higgins* at ¶ 19. Considering the above, appellant has not shown that any alleged error affected the outcome of the trial. As a result, we conclude the trial court did not commit plain error by not providing the jury with an instruction on self-defense.

{¶ 55} Accordingly, appellant's third assignment of error is overruled.

### D.  Fourth Assignment of Error

{¶ 56} Under the fourth assignment of error, appellant contends that she proved she was "entitled to mitigation under a theory of adequate provocation," thereby reducing the charge to the lesser-included offense of criminal trespass.[3]  (Appellant's Brief at 32.)

{¶ 57} Specifically, appellant argues that she was objectively sufficiently provoked so as to mitigate the offense to criminal trespass because appellant was distressed over her sick child, she had driven around town looking for her boyfriend and vehicle and found him at the home of another woman, her boyfriend answered the door naked and lead her upstairs to retrieve keys from his pants in another woman's bedroom, and was "struck by his adulterer."  (Appellant's Brief at 35.[4])  Appellant argues that, although she testified she was not upset, she was subjectively sufficiently provoked at the moment Cooksey called her an expletive and charged her, as well as due to her biological and maternal instincts that formed an urgency to care for her child.  Appellant argues she had no cooling off period, as she was aggressively attacked by Cooksey.

{¶ 58} Criminal trespass is a lesser-included offense of aggravated burglary.  *State v. Noor*, 10th Dist. No. 13AP-165, 2014-Ohio-3397, ¶ 79, *discretionary appeal not allowed*, 142 Ohio St.3d 1517, 2015-Ohio-2341.  However, as appellee notes, appellant did not request a jury instruction on criminal trespass and is not arguing an error in the instructions on appeal in this regard.  As such, we agree with appellee that the jury did not err by not finding appellant guilty of something on which it was never instructed.

{¶ 59} Furthermore, appellant provides us with no legal support for applying adequate provocation as a mitigating factor where a defendant is charged with aggravated burglary.  We independently find no case law which supports reducing aggravated burglary to criminal trespass due to provocation and, regardless, find the evidence pointed to by appellant as adequate provocation in this case to fall well short of provocation found in typical mitigation cases.  *See generally State v. Patterson*, 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 1-46; *Parnell* at ¶ 20-27.  For example, even assuming

---

[3] The assignment of error as stated in appellant's brief at page vi states "aggravated trespass[ing]."  However, because her later assignment of error and entire argument references "criminal trespassing," we will address the assignment of error in regard to criminal trespassing only.

[4] Appellant additionally inserts self-defense as an argument to bar her conviction.  However, this argument is not pertinent to resolving the assignment of error, and we have already addressed this issue in the third assignment of error.

arguendo that appellant could satisfy the objective prong of whether the provocation was reasonably sufficient to prompt sudden passion or fit of rage, appellant repeatedly testified to not being upset and presented no further record evidence regarding appellant's subjective emotional and mental state. Therefore, for all the above reasons, appellant's argument regarding mitigation to criminal trespass fails.

{¶ 60} Accordingly, appellant's fourth assignment of error is overruled.

### E. Fifth Assignment of Error

{¶ 61} Under the fifth assignment of error, appellant contends that she was denied her constitutional right to assistance of counsel due to her trial counsel's failure to object to the admission of hearsay evidence and failure to request a self-defense jury instruction. For the following reasons, we disagree.

{¶ 62} "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [court] cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "To establish a claim of ineffective assistance of counsel, a defendant must show that the performance of trial counsel was deficient and that the deficient performance prejudiced him." *State v. Frye*, 10th Dist. No. 14AP-988, 2015-Ohio-3012, ¶ 11, citing *Strickland* at 687.

{¶ 63} To demonstrate that counsel's performance was deficient, the defendant must show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *State v. Canada*, 10th Dist. No. 14AP-523, 2015-Ohio-2167, ¶ 89. In doing so, the defendant must overcome the strong presumption that counsel's performance was adequate or that counsel's actions might be considered sound trial strategy. *Id.* at ¶ 90. To demonstrate that the deficient performance prejudiced him, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *Strickland* at 694. "The failure to make either showing defeats a claim of ineffective assistance of counsel." *Frye* at ¶ 11, citing *Strickland* at 697.

{¶ 64} "It is well-settled that, 'debatable trial tactics do not give rise to a claim for ineffective assistance of counsel.' " *State v. Herrington*, 9th Dist. No. 25150, 2010-Ohio-6426, ¶ 9, quoting *State v. Hoehn*, 9th Dist. No. 03CA0076-M, 2004-Ohio-1419, ¶ 45.

Generally, the failure to request jury instructions is purely a matter of trial tactics and will not be disturbed on review. *Herrington* at ¶ 11. Likewise, trial counsel's failure to object to the admission of hearsay evidence " 'is within the realm of trial tactics and does not establish ineffective assistance of counsel.' " *State v. Kasser*, 10th Dist. No. 01AP-260 (Nov. 29, 2001), quoting *State v. Monroe*, 10th Dist. No. 01AP-275 (Sept. 25, 2001).

{¶ 65} Appellant's ineffectiveness of counsel contention related to the self-defense instruction builds on appellant's third assignment of error. Because appellant's trial counsel failed to object to this alleged error, we reviewed appellant's arguments under a plain-error standard and concluded that appellant neither showed that the trial court committed an error in failing to instruct the jury on self-defense in this case or showed that the lack of the instruction affected the outcome in the case. Considering and incorporating our previously stated reasoning, we find that appellant's trial counsel was not deficient in failing to request a jury instruction on self-defense, and there is not a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *State v. Roy*, 10th Dist. No. 14AP-223, 2014-Ohio-4587, ¶ 20, quoting *State v. Carson*, 10th Dist. No. 05AP-13, 2006-Ohio-2440, ¶ 51 (" '[W]here the failure to object does not constitute plain error, the issue cannot be reversed by claiming ineffective assistance of counsel.' "); *State v. Hughes*, 10th Dist. No. 14AP-360, 2015-Ohio-151, ¶ 53.

{¶ 66} Regarding her hearsay evidence contention, appellant argues that trial counsel was ineffective by failing to object to statements made by Williams to responding police, which appellant contends are hearsay. As provided above, a trial counsel's failure to object to hearsay statements is generally considered a part of trial strategy. Consistent with this general rule, the record in this case shows that defense counsel attempted to elicit testimony from the officers about Williams' and Cooksey's statements on the night of the incident which would work in appellant's favor. It was in one such attempt, in defense counsel's examination of Penhorwood, that the alleged statement to police regarding appellant not being allowed in the residence first materialized. Although the tactic may have backfired, we cannot say that defense counsel's failure to object to statements to responding police in this case give rise to a claim for ineffective assistance of counsel. Furthermore, because the statements challenged by appellant were cumulative with Cooksey's testimony, and Williams' and appellant's credibility were undermined by their

relationship and the improbable version of events they advanced, appellant has not demonstrated that due to the alleged deficient performance, there exists a reasonable probability that, but for counsel's errors, the result of the trial would have been different. Therefore, neither prong of *Stickland* is met, and appellant's claim of ineffective assistance of counsel fails.

{¶ 67} Accordingly, appellant's fifth assignment of error is overruled.

## IV.  CONCLUSION

{¶ 68} Having overruled appellant's five assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT, J., concurs.
TYACK, J., dissents.

TYACK, J., dissenting.

{¶ 69} Because the state of Ohio did not prove beyond a reasonable doubt that Christina M. Wilcox entered the residence of Amanda Cooksey by force, stealth, or deception, the state failed to prove an element of the charge of aggravated burglary.  As a result, Wilcox's conviction on a charge of aggravated burglary should be vacated.

{¶ 70} The only two persons who had personal knowledge of what happened at the instant Wilcox entered the residence were Wilcox and Don Williams.  Both of them testified that Williams opened the door and let Wilcox in.  Cooksey was upstairs, apparently putting her clothes on.  She did not hear the conversation between Williams and Wilcox at the time Wilcox entered.  Cooksey has and had no personal knowledge of who opened the door.

{¶ 71} If the only two persons who were in a position to know testified that Wilcox entered through an open door at the invitation of Williams, Wilcox did not enter by force, stealth, or deception.

{¶ 72} Cooksey clearly and understandably has no love for Wilcox, but her attempts to make Wilcox look worse and to make Wilcox guilty of more than a simple trespass simply are inconsistent with the admissible evidence.

{¶ 73} I would find that the jury's verdict was both supported by insufficient evidence and against the manifest weight of the evidence.  Since the majority of this panel does not, I respectfully dissent.

_____