[Cite as *State v. Workman*, 2024-Ohio-167.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

    Plaintiff-Appellee,                        :

                                      No. 21AP-607

v.                                                :   (C.P.C. No. 18CR-1283)

Traquan C. Workman,                               :   (REGULAR CALENDAR)

    Defendant-Appellant.                        :

                                             :

D E C I S I O N

Rendered on January 18, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Kimberly M. Bond* for appellee.

**On brief:** *Wolfe Law Group, LLC,* and *Stephen T. Wolfe* for appellant.

APPEAL from the Franklin County Court of Common Pleas

MENTEL, P.J.

{¶ 1} A jury of the Franklin County Court of Common Pleas convicted defendant-appellant, Traquan C. Workman, of multiple offenses that resulted in the death of Donavan Clemens, including aggravated murder and aggravated robbery. The trial court sentenced Mr. Workman to life in prison without parole, plus an additional 20 years. He appeals the conviction and sentence, arguing that the evidence was legally insufficient to support the conviction, the verdict was against the manifest weight of the evidence, and the trial court erred when sentencing him. For the reasons that follow, we conclude that no error occurred in the trial court and will affirm its judgment.

{¶ 2} On March 16, 2018, plaintiff-appellee, the State of Ohio, filed an indictment charging Mr. Workman with six offenses in connection with the shooting death of Donavan Clemens: aggravated burglary in violation of R.C. 2911.11, with a firearm specification under R.C. 2941.145(A); aggravated robbery in violation of R.C. 2911.01, with a firearm specification; aggravated murder in violation of R.C. 2903.01, with a firearm specification; murder in violation of R.C. 2903.02, with a firearm specification; felony murder in violation of R.C. 2903.02, with a firearm specification; and one count of tampering with evidence in violation of R.C. 2921.12, including a firearm specification under R.C. 2941.141(A). A codefendant, Monique Green, was charged with two counts of tampering with evidence and two counts of receiving stolen property in violation of R.C. 2913.51. (Mar. 16, 2018 Indictment.)

{¶ 3} Trial commenced on September 13, 2021. The state's first witness, F.C., testified that she and her husband, Donavan Clemens, had been married for 20 years. (Sept. 14, 2021 Tr. at 239.) She and her late husband started a business that provided "a landscaping and a lawn care service, [with] maintenance on the side." *Id.* at 241. Mr. Clemens had started doing maintenance work for K.L. as an independent contractor in January of 2018. *Id.* at 243. K.L. was also their landlord. *Id.* at 244.

{¶ 4} F.C. last spoke to her husband on February 5, 2018, around six o'clock in the evening. *Id.* at 244-45. Mr. Clemens told her that he was dropping off a coworker who was assisting him before going to do a job for K.L. *Id.* at 245. According to F.C., her husband drove a 2011 white Chevrolet Silverado pickup truck. *Id.* at 248.

{¶ 5} W.T. testified that he had known Mr. Clemens for 12 years and had worked "doing little odd jobs here and there, off and on" with him. *Id.* at 294-95. On February 5, 2018, he and Mr. Clemens trimmed trees at an apartment building near Summit Ave. before going to work at apartments on Hamilton Rd. *Id.* at 296-97. Some time between 5:30 and a little after 6:00 p.m., Mr. Clemens asked W.T. to go with him to Lowe's to pick up a part to fix a hot water tank. *Id.* at 297-98. W.T. declined and asked Mr. Clemens to drop him off at home. *Id.* at 298. Mr. Clemens told him that he was going to pick up the part and return to the apartment building. *Id.* at 298-99. After that, the "next thing" W.T. heard was that Mr. Clemens had been "shot and he was in the hospital." *Id.* at 299.

**{¶ 6}** K.L. is a real estate broker who managed the apartments at 1900, 1902 and 1904 Hamilton Rd. *Id.* at 278. He often used Mr. Clemens as a contractor and recalled that he "did good work." *Id.* at 279. Mr. Clemens had repaired "a few minor things" for a new tenant, J.J., on February 5, 2018, after picking up supplies from Lowe's. *Id.* at 279, 281. That day, K.L. "received a call from [J.J.]," who "was in distress." *Id.* at 282-83. J.J. "described a man banging on [her] car window and accusing her of stealing his truck" who appeared "bloody" and said he worked for K.L. *Id.* at 283. K.L. confirmed that the man was Mr. Clemens and drove to the apartments immediately. *Id.* When he arrived, police were already on the scene and Mr. Clemens had just been taken to the hospital. *Id.* at 283-84. K.L. provided the police with Mr. Clemens' cell phone number and a description of his white Chevrolet pickup truck. *Id.* at 285.

**{¶ 7}** J.J. testified that she lived at 1904 Hamilton Rd. in February of 2018. *Id.* at 342. She was in the process of moving into her apartment on the day of the shooting. *Id.* Mr. Clemens activated the hot water tank and left to buy new appliances for her apartment. *Id.* J.J. stated that she was "in and out all day" during the move. *Id.* at 343-44.

**{¶ 8}** Later, while J.J. sat in her parked car talking on the phone, Mr. Clemens "bumped into" it. *Id.* at 344. J.J. described Mr. Clemens as speaking to someone who wasn't there. *Id.* at 345. He said that "he was looking for somebody." *Id.* As he got closer to J.J.'s car, she noticed blood on the back of Mr. Clemens' head. *Id.* J.J. called the police and her landlord. *Id.* at 346.

**{¶ 9}** Officer Anthony Williams was on patrol in the area and responded to an emergency call from 1902 Hamilton Rd. *Id.* at 257-58. When he and his partner arrived, he saw "a man kind of stumbling around outside of the residence." *Id.* at 258. Officer Williams stayed with the victim while his partner went into the apartment complex. *Id.* at 258-59. The victim was "very disoriented" and could not say what had happened, only that "his head hurt." *Id.* at 259.

**{¶ 10}** Officer Williams' partner returned and he noticed that Mr. Clemens had "blood in his mouth, dried blood, and blood on his neck and the back of his head." *Id.* Officer Williams identified what he "believed to be an entry wound from a gunshot around the back right side of [the victim's] head and neck." *Id.* Mr. Clemens stated that "[h]e was there to work on one of the units in the apartment complex" and show an "apartment to a

potential tenant," and that "someone had taken his truck." *Id.* at 260. After that, the medics arrived, Mr. Clemens became "pretty much unresponsive," and they took him to the hospital. *Id.*

{¶ 11} Officer Phillip Jackson responded to a call regarding the February 5, 2018 shooting. *Id.* at 304. He was working on "plainclothes assignment" that day, which allows an officer "to respond to scenes undetected [and] to provide assistance with high-degree crimes or situations." *Id.* at 305. Officer Jackson and his partner responded to "make some initial contact or to come out and check out the area to see if [they] could recover the stolen vehicle." *Id.* at 306. They left the scene to search for the vehicle. *Id.* After driving north and turning left, they saw "a white truck matching the description parked on the right side of the road." *Id.* at 307. After confirming that the truck belonged to the victim, they drove by the vehicle but "didn't see anybody inside." *Id.* at 307-08.

{¶ 12} Officer Jackson and his partner parked and set up surveillance of the truck. *Id.* at 308. After a while, a man and woman, later identified as Mr. Workman and Monique Green, approached the vehicle, got inside, and began to drive away. *Id.* at 308-09. Officer Jackson and his partner began to follow the truck and called for backup. *Id.* at 309. The truck stopped and Ms. Green got out and began walking north. *Id.* at 309.

{¶ 13} Officer Adam Hardwick was also working on plainclothes assignment for the Columbus Division of Police on February 5, 2018. *Id.* at 388. He and his partner responded to Officer Jackson's request for assistance to follow the pickup truck. *Id.* at 390-91. After hearing that the truck had again parked, and a woman got out and began walking, Officer Hardwick got out of his car and began following her on foot. *Id.* at 391. He took out his badge and identified himself as a police officer, but she "continued to walk * * *, and then she started picking up the pace and walking faster." *Id.* at 392. As he followed her with the intention of detaining her, he saw that she "reached in her right pocket, pulled out a wallet, and threw it on the ground in front of her." *Id.* Officer Hardwick then arrested her. *Id.* "She immediately said, 'I didn't do anything.' " *Id.* A patrol car pulled up and took her into custody. *Id.* at 392-93. Officer Hardwick testified that the woman was Monique Green. *Id.* at 393. The parties stipulated that two wallets—the wallet Ms. Green threw down and another wallet recovered from her person after the arrest—belonged to the victim, Donavan Clemens. *Id.* at 394-95.

{¶ 14} Officer Jason Clark responded to plainclothes officers' report of having found the victim's truck. *Id.* at 402. He ordered Mr. Workman out of the truck and arrested him. *Id.* at 403. In the search conducted incident to the arrest, Officer Clark recovered a bottle of water, .380 caliber live ammunition, a cell phone, two nickels, cigarette butts, and a torch lighter from Mr. Workman. *Id.* at 405-11.

{¶ 15} Arthur Hughes is a detective at the Columbus Division of Police who conducted the homicide investigation of the shooting death of Donavan Clemens. *Id.* at 676-77. He was present at the scene when Mr. Workman and Ms. Green were arrested. *Id.* at 682. Detective Hughes testified that police recovered the victim's cell phone and two .380 caliber live rounds from Mr. Workman at that time. *Id.* at 694. Nevertheless, he released Mr. Workman the next day because he "felt the investigation wasn't complete" and wanted to collect more evidence. *Id.* at 696.

{¶ 16} Several weeks later, the crime lab informed Detective Hughes of a match between a shell casing from the scene of the shooting and a gun recently recovered. *Id.* at 698. Realizing that the gun was "obviously * * * the murder weapon," he went to interview G.S., who had accidently shot himself with it. *Id.* at 698, 701. G.S. showed the detective text messages about buying the weapon and the detective realized that G.S. had "actually made the purchase of the gun on the day of Mr. Clemens' death." *Id.* at 701. G.S. identified Mr. Workman to the detective as the person who had sold him the firearm. *Id.* at 704.

{¶ 17} G.S. also testified and stated that he knew Mr. Workman through a "mutual friend." *Id.* at 469. They communicated through an app on February 8, 2018, about G.S. purchasing a firearm from Mr. Workman and negotiated a price. *Id.* at 469-70. G.S. offered $120 and some marijuana for the weapon. *Id.* at 470. During the negotiation, Mr. Workman stated that "the gun got another body. Try to lock me up for 30 years." *Id.* at 483. G.S. interpreted that statement to mean that someone had been "shot by it" or that the gun was stolen. *Id.* The same day, they met at a Wendy's and completed the transaction. *Id.* at 472. Mr. Workman also included some bullets and a laser sight with the firearm, a Hi-Point CF-380. *Id.* at 473.

{¶ 18} Thirteen days later, the weapon "misfired" while G.S. was attempting to pull it out of a holster, discharging a bullet into his left hip. *Id.* at 473-74. Police arrived, ran a check on the gun, and confiscated it from G.S. because it had been reported stolen. *Id.*

{¶ 19} Detective Hughes obtained a warrant to access Mr. Workman's Facebook account. *Id.* at 709. Mr. Workman's account had pictures of a firearm of the same make and caliber as the murder weapon posted a month before the murder. *Id.* at 716. The weapon in the photograph also had hand-painted black and silver paint on it that matched the murder weapon. *Id.* at 715. Another photograph of the weapon had a comment dated 12 days after the shooting, in which Mr. Workman responded to asking if the weapon was loud by stating: "Hell, yeah. Mines had my ears ringing when I blasted dude." *Id.* at 721.

{¶ 20} Detective Richard Bair is assigned to the Crime Scene Search Unit of the Columbus Division of Police. *Id.* at 349-50. He took photographs of the crime scene at the Hamilton Rd. apartments and collected swabs of blood from the stairway into the basement of the apartment building and the basement itself. *Id.* at 358-64. Detective Bair also collected the spent casing from a bullet in the basement, a Lowe's receipt, Carhartt overalls, and coins scattered on the floor. *Id.* at 368-70. In addition, he collected and photographed blood on a stove. *Id.* at 371. The detective also photographed "possible blood splatter on the baseline of the wall." *Id.* at 373. The parties stipulated that the samples taken by Detective Bair were from the victim, Donavan Clemens, as was a palm print on the stove in the basement. *Id.* at 379. The parties also stipulated that the Carhartt overalls belonged to Mr. Clemens, and that DNA from their interior pocket matched both his DNA and that of Monique Green. *Id.* at 384.

{¶ 21} Brian Johnson is a forensic scientist in the firearms section of the Crime Laboratory of the Columbus Division of Police. *Id.* at 512. He described a firearm database, the National Integrated Ballistic Information Network ("NIBIN"), into which firearms and test fire data are entered for any firearm turned into the lab. *Id.* at 517-18. The database uses the "individual sort of pattern on various parts of the cartridge case" that a particular firearm creates during discharge to make a probabilistic determination of whether another cartridge was fired from the same weapon. *Id.* at 520. Once NIBIN makes the association, further testing "with human eyes" is performed "to fully make that determination." *Id.* at 521.

{¶ 22} The cartridge from the 1902 Hamilton Rd. basement was compared with the cartridge that G.S. inadvertently discharged. *Id.* at 523. NIBIN found an association between the cartridges. *Id.* at 524. Mr. Johnson performed a test fire with the weapon

recovered from G.S. and determined that it worked. *Id.* at 529. He then used a microscope to compare cartridges from the test firings with the cartridges recovered from G.S. and the crime scene. *Id.* at 530-31. According to Mr. Johnson, there were "microscopic indentations that were left behind by the firing pin" on the recovered cartridges that "were common to all of the test fires" that he performed. *Id.* at 534. In his professional opinion, the cartridge casing recovered from the Hamilton Rd. scene was fired by the weapon that Mr. Workman sold to G.S. *Id.* at 539.

{¶ 23} Donna Schwesinger, a forensic scientist from the Ohio Bureau of Criminal Identification and Investigation who performs gunshot residue analysis, performed tests on samples taken from the clothing of Mr. Workman and Ms. Green. *Id.* at 565, 577-79. She identified multiple particles of gunshot residue on Mr. Workman's coat, a single particle on Ms. Green's coat, and multiple particles on Ms. Green's jeans. *Id.* at 578-79. Samples taken from Mr. Workman's hand did not test positive for gunshot residue. *Id.* at 583.

{¶ 24} Maneesha Pandey, M.D., is a forensic pathologist and deputy coroner at the Franklin County Coroner's Office. *Id.* at 603. Dr. Pandey did not perform the autopsy on the victim, but did review the report, photographs, and toxicology results. *Id.* at 611. The victim's cause of death was determined to be a gunshot wound to the head. *Id.* at 612. The bullet broke the victim's skull and was retrieved from it as evidence. *Id.* The manner of death was determined to be a homicide. *Id.* at 613-14.

{¶ 25} Deputy Zachary Brown works for the Franklin County Sheriff's Office at its Jackson Pike correctional facility, where Mr. Workman was incarcerated. *Id.* at 592-93. He testified that Mr. Workman gave him a letter and asked for it to be notarized. *Id.* at 593. Deputy Brown read the letter, introduced as State's Exhibit 184, to the jury. *Id.* at 595. In the letter, Mr. Workman stated that on the day of the "accident," he and Ms. Greene wanted money. *Id.* Mr. Workman "grabbed the gun, and then walked to the store to find somebody to rob," where they encountered the victim. *Id.* He claimed that the victim offered him money for sex, "but when he pulled down his pants and turned around, I shot him. I hurried and grabbed everything that I could and left." *Id.* at 596. Mr. Workman also wrote that he intended to "get to the truck and clean it with bleach, but the police caught us." *Id.*

{¶ 26} Mr. Workman called no witnesses in his defense. The jury convicted him on all counts stated in the indictment. The trial court merged the aggravated burglary conviction with the aggravated robbery conviction and merged the two murder convictions with the aggravated murder conviction. With the other offenses and the firearm specifications, the trial court sentenced Mr. Workman to life in prison without parole, plus an additional 20 years. (Oct. 21, 2021 Jgmt. Entry.)

{¶ 27} Mr. Workman appeals and has asserted the following assignments of error:

> [1.] The evidence presented at trial was insufficient to support the convictions.

> [2.] The jury's verdicts were against the manifest weight of the evidence.

> [3.] The trial court erred when it imposed the maximum sentence on the highest degree offense.

> [4.] The trial court erred when it imposed a consecutive prison term for the specification to Count 6.

{¶ 28} In the first assignment of error, Mr. Workman asserts that the state's evidence was legally insufficient to support his convictions. Legal sufficiency is a question of law that asks whether the state's evidence passes a "test of adequacy." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). To test the sufficiency of the evidence, a reviewing court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, ¶ 24, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4.

{¶ 29} Mr. Workman first addresses the aggravated burglary conviction and contends that "there was no proof of a trespass." (Brief of Appellant at 9.) He claims that there was no evidence that he ever entered an apartment, and if there was, the victim invited him, pointing to Mr. Clemens' statement to a first responder that he had been showing an apartment. *Id.* at 9-10.

{¶ 30} The definition of aggravated burglary states: "No person, by force, stealth, or deception, shall trespass in an occupied structure * * *, with purpose to commit in the structure * * * any criminal offense, if any of the following apply: (1) The offender inflicts,

or attempts or threatens to inflict physical harm on another; (2) The offender has a deadly weapon * * *." R.C. 2911.11(A). The relevant definition of trespass states: "No person, without privilege to do so, shall * * * [k]nowingly enter or remain on the land or premises of another." R.C. 2911.21(A)(1).

{¶ 31} Even "assuming lawful initial entry," the act of inflicting physical harm on another raises "a powerful inference" that the defendant's privilege terminated the moment the assault commenced. *State v. Steffen*, 31 Ohio St.3d 111, 115 (1987). Applying *Steffen*, this court has recognized that " 'permission to enter a home is deemed terminated by the act of committing an offense of violence against a person authorized to revoke the permission.' " *State v. Wilcox*, 10th Dist. No. 15AP-957, 2016-Ohio-7865, ¶ 32, quoting *State v. Metcalf*, 2d Dist. No. 24338, 2012-Ohio-6045, ¶ 20, quoting 2 Katz, Martin, Lipton & Crocker, *Criminal Law*, Section 104:6 (3d Ed.). Apart from the extensive ballistic and forensic evidence linking the murder weapon to Mr. Workman, as well as his subsequent sale of the weapon, the state introduced Mr. Workman's own written confession to killing the victim. Viewing this evidence in a light most favorable to the state, a rational jury could conclude that any privilege he enjoyed to remain on the property terminated that instant, satisfying the element of trespass in the aggravated burglary conviction.

{¶ 32} Mr. Workman also asserts that the state "failed to prove that a theft offense was committed," rendering his conviction for aggravated robbery legally insufficient. (Brief of Appellant at 10.) Although he admits that he and Ms. Green "were found with [the victim's] belongings, there was no testimony as to how they acquired them." *Id.*

{¶ 33} A theft offense is an element of aggravated robbery. *See* R.C. 2911.01(A) (defining aggravated robbery to include the commission of or attempt to commit "a theft offense"). The relevant definition of the offense of theft states: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent * * *." R.C. 2913.02(A)(1). Detective Hughes testified that Mr. Workman was in possession of the victim's cellphone when he was arrested shortly after the shooting. Mr. Workman's letter of confession stated that he and Ms. Green intended to rob a person that day, and that after he shot Mr. Clemens, he "grabbed everything that [he] could and left." (Tr. at 596; State's Ex. 184.) A reasonable jury could infer that this included the

victim's cellphone, as it was found on Mr. Workman's person shortly thereafter by the police. Moreover, he was arrested inside the victim's pickup truck, and a reasonable jury could infer that he obtained it by taking the keys from Mr. Clemens after shooting him. The state's evidence was legally sufficient to prove the offense of theft of any of these items that belonged to the victim. Mr. Workman makes no other argument against the legal sufficiency of the aggravated robbery conviction.

{¶ 34} With regards to his conviction for aggravated murder, Mr. Workman argues that "there was no evidence of prior calculation or design or, alternatively, that [the victim's] death was caused while committing a robbery." (Brief of Appellant at 10.) Countering this argument, the state points out that he was not indicted for aggravated murder under R.C. 2903.01(A) with the element of prior calculation and design, and that there was "compelling evidence" that Mr. Workman murdered Mr. Clemens while committing aggravated robbery and burglary, as required by R.C. 2903.01(B).

{¶ 35} The relevant definition of aggravated murder states: "No person shall purposely cause the death of another * * * while committing or attempting to commit * * * aggravated robbery [or] aggravated burglary * * *." R.C. 2903.01(B) The indictment alleged that Mr. Workman "purposely cause[d] the death of Donavan Clemens while committing, or attempting to commit, or while fleeing immediately after committing or attempting to commit the offense of Aggravated Burglary and/or Aggravated Robbery." (Mar. 16, 2018 Indictment at 2.) No mention is made of prior calculation or design, so the state is correct that it was only required to produce evidence that Mr. Workman committed aggravated burglary or aggravated robbery as an element of aggravated murder.

{¶ 36} For the reasons discussed, the state's evidence was legally sufficient for a reasonable jury to conclude that Mr. Workman committed either aggravated burglary or aggravated robbery, the only elements of aggravated murder that Mr. Workman challenges. In addition to the evidence previously mentioned, the state produced extensive evidence that a struggle occurred and items were taken from the victim contemporaneously with the shooting, including scattered coins on the floor, the presence of the victim's abandoned overalls, his codefendant's DNA in their pockets, and the recovery of his personal items from Mr. Workman and Ms. Greene. Again, apart from the state's forensic and ballistic

evidence, Mr. Workman admits killing the victim. The evidence supporting the aggravated murder conviction was not merely legally sufficient, it was overwhelming.

{¶ 37} Mr. Workman also argues that the evidence was legally insufficient to support the conviction for tampering with evidence. He argues that the element requiring the state to prove that he knowingly removed the firearm with the purpose to impair its availability was not met because he merely sold it to G.S. instead of throwing it away. (Brief of Appellant at 10.)

{¶ 38} The offense of tampering with evidence is defined as follows: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." R.C. 2921.12(A)(1). A rational jury could conclude that Mr. Workman sought to conceal the existence of the murder weapon by selling it to G.S. for the purpose of impairing its availability in the investigation of Mr. Clemens' death. The evidence showed that Mr. Workman was aware of the murder investigation because he was arrested near the scene, questioned by a police detective, and released the next day. The evidence the state introduced of the chats with G.S. from his phone demonstrates that he almost immediately began the process of selling the weapon.

{¶ 39} Simply put, an item may be concealed or removed by the act of selling it to a stranger. A jury could reasonably infer that Mr. Workman sold it to sever its association with himself, a person of interest in the investigation, as well as remove it from his own possession. The statute does not limit the state's ability to show impairment of availability to situations where an item is thrown away, as Mr. Workman suggests. His "argument that he could have used a different, more successful form of concealment * * * is of no legal import." *State v. Rock*, 3d Dist. No. 13-13-38, 2014-Ohio-1786, ¶ 22 (rejecting appellant's argument that evidence that he had tossed pills to conceal them temporarily was legally insufficient under R.C. 2921.12(A)(1) because he could have instead "hid[] the pills on his person or swallow[ed] them"). As with all other convictions discussed, the state's evidence was not legally insufficient to support the conviction for tampering with evidence. The first assignment of error is overruled.

{¶ 40} Mr. Workman's second assignment of error asserts that the manifest weight of the state's evidence did not support his convictions. The manifest weight of the evidence standard of review requires the appellate court to consider the state's evidence as an additional, or "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks,* 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168, citing *Thompkins* at 387. Reversal on manifest weight grounds is appropriate " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 41} Mr. Workman makes no additional argument to support the second assignment of error beyond incorporating those made in support of his challenge to the legal sufficiency of the evidence in the first assignment of error. (Brief of Appellant at 12.) Our review of the state's evidence, including the testimony of investigators and forensics experts, the forensic evidence, and Mr. Workman's own admissions in text messages sent to G.S. and the letter he wrote while incarcerated, leads to the conclusion that the evidence weighed heavily in favor of the jury's convictions. We discern no conflicts in the evidence or credibility issues of the witnesses to question the verdicts. The second assignment of error is overruled.

{¶ 42} In the third assignment of error, Mr. Workman argues that the trial court erred by imposing the maximum sentence, life without parole for aggravated murder, which he contends is "unreasonable and arbitrary" when reviewed under R.C. 2953.08. (Brief of Appellant at 13.) The state responds that, under R.C. 2953.08(D), this court lacks jurisdiction to review a sentence for aggravated murder. (Brief of Plaintiff-Appellee at 24.)

{¶ 43} The trial court sentenced Mr. Workman to life without parole on the aggravated murder conviction. (Oct. 21, 2021 Jgmt. Entry at 2.) "Life imprisonment without parole" is one of the penalties for aggravated murder. R.C. 2929.03(A)(1)(a). Generally, R.C. 2953.08 describes a defendant's right to appeal a sentence of conviction. However, the statute states: "A sentence imposed for aggravated murder or murder

pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review under this section." R.C. 2953.08(D)(3). Mr. Workman seeks review of his sentence under R.C. 2953.08, but R.C. 2953.08(D)(3) "precludes review of such sentences under R.C. 2953.08 on the specific grounds that the statute provides." *State v. Grevious*, ___ Ohio St.3d ___, 2022-Ohio-4361, ¶ 24. Although "R.C. 2953.08 is not the only means of appellate review of an aggravated-murder sentence," Mr. Workman has not invoked any other grounds to review the sentence, such as a constitutional challenge. *Id.*, citing *State v. Patrick*, 164 Ohio St.3d 309, 2020-Ohio-6803, ¶ 15. *See also State v. Smith*, 1st Dist. No. C-180227, 2020-Ohio-649, ¶ 40 (holding that appellate court was precluded from reviewing appellant's sentence imposed for aggravated murder conviction because it was "bound by the dictates of the statute"). Accordingly, we must overrule the third assignment of error.

{¶ 44} In the fourth and final assignment of error, Mr. Workman argues that the trial court erred under R.C. 2929.14(B)(1)(g) when it imposed a consecutive prison term for the firearm specification from the tampering with evidence conviction. (Brief of Appellant at 14.) He argues that because tampering with evidence is not listed in the statute, "a specification to it cannot be run consecutive with other specifications." *Id.* at 15. The state disagrees and argues that the "plain language" of the statute refers to the discretion of the trial court, and therefore allows a consecutive prison term for the specification. (Brief of Plaintiff-Appellee at 28-30.)

{¶ 45} The standard of appellate review of a sentence is governed by R.C. 2953.08(G). "The appellate court's standard for review is not whether the sentencing court abused its discretion." R.C. 2953.08(G)(2). Rather, the appellate court "may increase, reduce, or otherwise modify a sentence * * * or may vacate the sentence and remand the matter to the sentencing court for resentencing," but only if it "clearly and convincingly finds" that either 1) "the record does not support the sentencing court's" statutory findings; or 2) "the sentence is otherwise contrary to law." *Id.* Only the latter of the two standards is invoked by Mr. Workman's argument.

{¶ 46} We note initially that neither party has identified the actual statutory basis for the trial court's consecutive imposition of the firearm specification to the tampering with evidence conviction. The jury convicted Mr. Workman of aggravated murder and

aggravated robbery, both with firearm specifications under R.C. 2941.145(A), as well as tampering with evidence with a firearm specification under R.C. 2941.141(A). (Oct. 21, 2021 Jgmt. Entry.) The prison terms for those specifications are set forth in R.C. 2929.14(B)(1)(a), which states:

> [I]f an offender who is convicted of * * * a felony also is convicted of * * * a specification of the type described in section 2941.141, 2941.144, or 2941.145 of the Revised Code, the court shall impose on the offender one of the following prison terms: * * *
>
> (ii) A prison term of three years if the specification is of the type described in division (A) of section 2941.145 of the Revised Code that charges the offender with having a firearm on or about the offender's person or under the offender's control while committing the offense and displaying the firearm, brandishing the firearm, indicating that the offender possessed the firearm, or using it to facilitate the offense;
>
> (iii) A prison term of one year if the specification is of the type described in division (A) of section 2941.141 of the Revised Code that charges the offender with having a firearm on or about the offender's person or under the offender's control while committing the offense * * *.

{¶ 47} Prison terms for the firearm specifications described under R.C. 2929.14(B)(1)(a) are "mandatory." *State v. Moore*, 154 Ohio St.3d 94, 2018-Ohio-3237, ¶ 9. Furthermore, under R.C. 2929.14(C)(1)(a), those prison terms must be served consecutively. The statute states:

> *if a mandatory prison term is imposed upon an offender pursuant to division (B)(1)(a) of this section* for having a firearm on or about the offender's person or under the offender's control while committing a felony, if a mandatory prison term is imposed upon an offender pursuant to division (B)(1)(c) of this section for committing a felony specified in that division by discharging a firearm from a motor vehicle, or if both types of mandatory prison terms are imposed, *the offender shall serve any mandatory prison term imposed under either division consecutively to any other mandatory prison term imposed* under either division * * * and consecutively to any other prison term or mandatory prison term previously or subsequently imposed upon the offender.

(Emphasis added.) R.C. 2929.14(C)(1)(a).

{¶ 48} Thus, at first glance, R.C. 2929.14(C)(1)(a) required the trial court to impose consecutive prison terms for the three firearm specifications associated with Mr. Workman's convictions. However, another section of the sentencing statute prohibits the imposition of consecutive sentences for (B)(1)(a) firearm specifications if they arise from "felonies committed as part of the same act or transaction." R.C. 2929.14(B)(1)(b). In its entirety, that provision states: "Except as provided in division (B)(1)(g) of this section, a court shall not impose more than one prison term on an offender under division (B)(1)(a) of this section for felonies committed as part of the same act or transaction." R.C. 2929.14(B)(1)(b). *See also State v. Bollar*, __ Ohio St.3d __, 2022-Ohio-4370, ¶ 23 ("R.C. 2929.14(B)(1)(b) sets forth a general rule that is explicitly limited by R.C. 2929.14(B)(1)(g).")

{¶ 49} A "transaction" under R.C. 2929.14(B)(1)(b) may be defined as " 'a series of continuous acts bound together by time, space and purpose, and directed toward a single objective.' " *State v. Wills*, 69 Ohio St.3d 690, 691 (1994), quoting *State v. Caldwell*, 9th Dist. No. 14720, 1991 Ohio App. LEXIS 5879, *32 (Dec. 4, 1991) (interpreting former R.C. 2929.71(B), the previous statute governing "cases where multiple offenses are committed with the assistance of a firearm by the same defendant"). *See also State v. Crawley*, 10th Dist. No. 21AP-658, 2023-Ohio-1492, ¶ 62 (applying definition of "transaction" in *Wills* to R.C. 2929.14(B)(1)(b)). Because the acts Mr. Workman committed that resulted in his aggravated robbery conviction were also necessary to prove his aggravated murder conviction, they formed a series of continuous acts performed contemporaneously and with a single objective. Thus, they were "part of the same act or transaction" under R.C. 2929.14(B)(1)(b), and the prison terms for their firearm specifications could not be imposed consecutively but for the exception referenced under R.C. 2929.14(B)(1)(g). Note, however, that the prison term for the tampering with evidence conviction firearm specification is not subject to the "same act or transaction" prohibition on consecutive sentences under R.C. 2929.14(B)(1)(b), so the R.C. 2929.14(C)(1)(a) requirement of consecutive imposition still applies to it.

{¶ 50} This brings us finally to the R.C. 2929.14(B)(1)(g) exception, which states:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted

murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶ 51} R.C. 2929.14(B)(1)(g) overrides the R.C. 2929.14(B)(1)(b) "same act or transaction" prohibition on consecutive firearm specification prison terms for the offenses it lists and requires a court to impose them for the two most "serious specifications." Because the jury convicted Mr. Workman of aggravated murder and aggravated robbery, R.C. 2929.14(B)(1)(g) requires consecutive prison terms for their firearm specifications.

{¶ 52} As discussed, R.C. 2929.14(B)(1)(g) does not apply to the prison term for the firearm specification for the tampering with evidence conviction because that requirement arose under R.C. 2929.14(C)(1)(a), the starting point for determining consecutive sentencing of firearm specifications. Thus, Mr. Workman's argument that the trial court erred by imposing a consecutive sentence under R.C. 2929.14(B)(1)(g) for the tampering with evidence firearm specification is based on a mistaken premise. He has failed to identify any error in the trial court's imposition of his sentence, much less one that is clearly and convincingly contrary to law as required by R.C. 2953.08(G)(2). Accordingly, the fourth assignment of error is overruled.

{¶ 53} For the foregoing reasons, all four of Mr. Workman's assignments of error are overruled. Accordingly, the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

BEATTY BLUNT, J., concurs.
LUPER SCHUSTER, J., concurring in judgment only.

_____